PHILADELPHIA PRINTING PRESSMEN'S UNION NO. 16, ANILINE DIVISION, Appellant,

v.

INTERNATIONAL PAPER COMPANY, SINGLE SERVICE DIVISION, Appellee.

No. 80–2070.

United States Court of Appeals, Third Circuit.

Argued Feb. 26, 1981.

Decided May 4, 1981.

Kenneth D. Freeman (argued), Casper & Beavers, P. C., Philadelphia, Pa., for appellant Philadelphia Printing Pressmen's Union No. 16, Aniline Division.

Richard J. Reibstein (argued), Andrew E. Zelman, Seham, Klein & Zelman, New York City, Robert J. Spiegel, Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., for appellee International Paper Co., Single Service Division.

Before WEIS and GARTH, Circuit Judges, and MILLER,* Judge.

## OPINION OF THE COURT

MILLER, Judge.

This appeal is from an order of the district court granting defendant-appellee's motion for summary judgment and denying plaintiff-appellant's cross-motion for summary judgment. Plaintiff's action under section 301 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 185(a)), was for a permanent injunction to compel defendant to proceed with arbitration of an alleged grievance in accordance with the provisions of the parties' collective bargaining agreement. We affirm.

## BACKGROUND

In May of 1977, one of the employees of International Paper Company ("IP"), Allen Axilrod, a member of the Philadelphia Printing Pressmen's Union No. 16, Aniline Division ("Union"), was injured in an auto accident unrelated to his employment and was placed on disability leave for six months. Upon conclusion of the disability leave in November of 1977, and not having heard from or been able by telephone to contact Axilrod, IP's plant superintendent wrote Axilrod on November 28, 1977, advising that he had used up his weekly disability benefits as of November 17 and granting him a leave of absence of sixty days. The letter, a copy of which was sent to the Union, stated: "If you can not return to work by Monday January 16, 1978 we will then drop you from our records." According to the Union's Business Agent, he telephoned IP's plant superintendent on November 28, 1977, and "orally notified him of our objections to the company's system of limited leaves of absence, and subsequent termination, especially because Mr. Axilrod was physically unable to return to work at the end of his leave of absence." Not having heard from Axilrod, IP terminated him on January 16, 1978. On or about January 24, Axilrod advised the plant superintendent by telephone that he was not yet physically able to return to work, and asked whether he would be able to return to work sometime in the future. He was informed that he had already been terminated "as he did not return to work during the period of his leave or otherwise contact the Company during that time."[1] Neither Axilrod nor the Union made any protest, oral or written, and the Union did not again contact IP

---

* The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. Axilrod's termination was confirmed by letter dated February 8, 1978, with a copy to the Union.

regarding Axilrod's termination until December 15, 1978, when its Business Agent wrote:

> The Union would like Management to reconsider their termination of Mr. Axilrod, and return him to his original place on the Company's Seniority List.

Meanwhile, on February 1, 1978, IP hired a replacement for Axilrod, and on March 1, 1978, the replacement, having completed his trial period, achieved seniority status.[2] At a meeting on December 21, 1978, between representatives of both parties, the Union's Business Agent repeated the request of December 15 that IP reconsider its decision to terminate Axilrod, but there was no challenge to the Company's action. Thereafter, letters were exchanged between the parties, the Federal Mediation and Conciliation Service, and the American Arbitration Association,[3] with IP consistently maintaining that no grievance had ever been filed with respect to Axilrod's termination and that it would, therefore, not proceed to arbitration. On August 16, 1979, the Union brought its action.

The collective bargaining agreement, in pertinent part, provides as follows:

Article 5—Adjustments of Complaints

*Section 1*

For the purpose of this agreement, the term "grievance" means any dispute between the company and the union, or between the company and any employee, concerning the effect, interpretation, application, claim of breach of [sic "or"] violation of this agreement.

*Section 2*

Any such grievance shall be settled in accordance with the following grievance procedure:

A.) The dispute, or grievance, shall be taken up by the Chairman or Vice Chairman, the aggrieved employee and the foreman of the department involved within three (3) working days of the occurrence. The foreman must give his answer within five (5) working days.

B.) Should the Chairman or Vice Chairman be unable to adjust the matter satisfactorily with the foreman, *the grievance shall be reduced to writing* and referred to the proper department head within five (5) working days of the foreman's answer. The department head shall render his decision in writing within five (5) working days from the time the grievance has been presented to him.

[Emphasis supplied.]

C.) If no satisfactory settlement is reached between the Chairman and Vice Chairman and the department head, the dispute may be referred to the Plant Manager within ten (10) working days.

D.) If no satisfactory settlement is reached between the Chairman or Vice Chairman and the Plant Manager within ten (10) working days, the Chairman shall call in a representative of the union, who shall meet with the representative of the general management of the company and the grievance committee.

E.) If the representative of the General Management of the company and the Union representative are unable to resolve the dispute, either party may

---

2. According to an affidavit of the plant superintendent, "Had I known that the Union was going to challenge Mr. Axilrod's removal from IP's payroll, Mr. Fee [the replacement] would not have been hired as a regular employee but would have been hired on a temporary basis so that he could be replaced by Mr. Axilrod if and when Mr. Axilrod was deemed entitled to reinstatement. Not having received a grievance or complaint concerning Mr. Axilrod's removal from our payroll, I assumed that the matter was settled and, as a result, Mr. Fee was hired as a regular employee." The Company's argu-

ment below based on laches has not been renewed on appeal.

3. By letter dated March 20, 1979, the Union's counsel wrote to the American Arbitration Association stating that the Union was submitting its case to arbitration and asking for a list of arbitrators. After a series of letters from counsel of both parties and the Association, the Union indicated that it was proceeding with the Federal Mediation and Conciliation Service, as provided by the collective bargaining agreement.

submit the dispute to arbitration within ten (10) working days by written request.

Article 5 of the agreement then goes on to provide for selection of "a mutually satisfactory, impartial Arbitrator," and failing this, for request by both parties that the Federal Mediation and Conciliation Service submit a list of qualified persons from which the arbitrator is to be selected. The article finally provides as follows:

> I.) A complaint shall be considered settled if it is not carried forward to the next step within the specified time limits.... Time limits may be extended by mutual consent in writing....

Article 6 of the agreement provides that "there shall be no strikes, walkouts, lockouts, or similar interruption of work during the period of this agreement," and that this provision applies even should there be any differences over grievances.

## ANALYSIS

■ Appellant argues that the district court exceeded its scope of authority by interpreting the collective bargaining agreement which, it says, is an area "exclusively the domain of arbitration." It quotes from *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964) for the statement:

> Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

However, appellant's use of the quotation begs the question of whether, indeed, the parties here are obligated to submit the Axilrod matter to arbitration and overlooks the statement quoted from *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1321, 8 L.Ed.2d 462 (1962), in *Wiley, id.* at 547, 84 S.Ct. at 913, that—

whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.

Although the parties could have provided that any dispute over whether there is an arbitrable dispute would be for the arbitrator,[4] this was not done. Accordingly, the issue of arbitrability of the Axilrod matter remained in the court, where the Congress placed it by section 301 of the Labor Management Relations Act. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *Westinghouse Broadcasting Co. v. Local 804, International Alliance of Theatrical Stage Employees*, 616 F.2d 97, 98 (3d Cir. 1980); *International Brotherhood of Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Association*, 574 F.2d 783, 787 (3d Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978); *Local 103, International Union of Electrical, Radio & Machine Workers v. RCA Corporation*, 516 F.2d 1336, 1339 (3d Cir. 1975), *Local 616, International Union of Electrical, Radio & Machine Workers v. Byrd Plastics, Inc.*, 428 F.2d 23, 25 (3d Cir. 1970).

■ In granting IP's motion for summary judgment, the district court declared it was doing so—

> because the grievance was not reduced to writing as is required by the collective bargaining agreement, Article 5, Section 2 B.

The Union argues that, assuming arguendo the court did not exceed its scope of authority, the issue of adequacy of notice raised by the pleadings and affidavits "created a genuine issue of material fact," so that summary judgment was inappropriate under Rule 56(e), Fed.R.Civ.P. However, the only such "issue" arises from the Union's bald assertion that there might be "overriding considerations which would militate against exalting substance over form, especially when a finding of adequate oral no-

---

4. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 571, 80 S.Ct. 1343, 1364, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring).

tice is made." The record does not reveal any such "finding"; and the "overriding considerations" are not specified. Accordingly, the argument must fail. *See Robin Construction Co. v. United States,* 345 F.2d 610, 613 (3d Cir. 1965).

In its statement of issues to be presented on appeal, the Union raises the question of whether the district court erred ("in concluding that no cause of action exists") under the circumstances of "a broad grievance-arbitration procedure, . . . *oral notice of complaint* . . . and request made by the appellant-union to proceed to binding arbitration." (Emphasis supplied.) It labels the requirement of a written statement of the grievance a "mere procedural formality," and raises the question of whether, in light of a national policy of encouraging settlement of labor disputes by arbitration, a grievant should be prevented from proceeding to binding arbitration simply because he failed to comply with that "procedural formality." However, there is no basis in the record or in the agreement, itself, for concluding that the parties regarded the requirement of a written statement of an alleged grievance as a "mere procedural formality" to be dispensed with unilaterally. Such a requirement is obviously desirable to avoid misunderstandings of the parties over the precise nature of an alleged grievance. Although Article 5 I.) provides that time limits may be extended "by mutual consent in writing," there is no provision in Article 5 B.) for dispensing with, by mutual consent or otherwise, the provision that "the grievance *shall* be reduced to writing." (Emphasis supplied.) Nor is there any evidence of waiver by IP of the requirement that a grievance be reduced to writing. Indeed, at the meeting on December 21, 1978, IP's Senior Industrial Relations Representative suggested to the Union's Business Agent that if he wished to formally press the Axilrod matter and challenge IP's action, he should file a formal grievance over Axilrod's termination, although IP maintained that the time limits for filing a grievance had expired.[5] We note that the Union does not claim, and we do not consider, its letter of December 15, 1978, requesting IP to "reconsider their termination of Mr. Axilrod," to be a reduction of a grievance to writing, much less an invocation of the grievance procedure spelled out in the agreement. The national policy of encouraging settlement of labor disputes by arbitration[6] would be ill served if it were used to justify unilateral abridgement of express grievance provisions of collective bargaining agreements. As the Supreme Court said in *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 581, 80 S.Ct. at 1352:

> But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. . . . The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

What the Union seeks is to skip the entire grievance machinery established by the collective bargaining agreement and to proceed directly to arbitration of a controversy that has not ripened into a grievance.[7] This it may not do.

---

5. On the record before us, it does not appear that there was any mutual consent *in writing* (Article 5, Section I.)) extending the time limits provided in Article 5, so that the assumption of IP that the Axilrod matter had been "settled" was fully justified.

6. Section 203(d), Labor Management Relations Act of 1947, as amended (29 U.S.C. § 173(d)); *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 377, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974); *Local 616, Int'l Union of Electrical, Radio & Mach. Workers v. Byrd Plastics, Inc., supra* at 23, 25.

7. This is far different from a case where the union has detailed its dispute in writing as required by the collective bargaining agreement and the union's only failure to comply with the grievance machinery is procedural. *See Chauffeurs, Teamsters & Helpers v. Stroehmann Bros.,* 625 F.2d 1092 (3d Cir. 1980). In *Chauffeurs* the court found that the parties were in agreement that the underlying dispute was arbitrable and that "the significance of a default [delay and failure to furnish a copy of the submission] in literal compliance with a contractual procedural requirement" was a matter

Accordingly, we hold that the district court did not err in granting IP's motion for summary judgment.[8]

The judgment of the district court will be affirmed.

for the arbitrator. *Id.* at 1093. In the present case by contrast, the Union's failure is neither procedural nor merely "literal," it is total, thereby preventing the dispute from ripening into a grievance.

**8.** We recognize that doubts over the arbitrability of an alleged dispute should be resolved in favor of arbitration. *United Steelworkers v.* *Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582–83, 80 S.Ct. at 1353; *Westinghouse Broadcasting Co. v. Local 804, Int'l Alliance of Theatrical Stage Employees, supra* at 100; *United Steelworkers v. Canron, Inc.*, 580 F.2d 77, 82 (3d Cir. 1978). However, we can state with positive assurance that we have no doubts in this case.