NEWMAN, Circuit Judge,
dissenting.
The court today acts en banc to impose a new and far-reaching restriction on the kinds of inventions that are eligible to participate in the patent system. The court achieves this result by redefining the word “process” in the patent statute, to exclude all processes that do not transform physical matter or that are not performed by machines. The court thus excludes many of the kinds of inventions that apply today’s electronic and photonic technologies, as well as other processes that handle data and information in novel ways. Such processes have long been patent eligible, and contribute to the vigor and variety of today’s Information Age. This exclusion of process inventions is contrary to statute, contrary to precedent, and a negation of the constitutional mandate. Its impact on the future, as well as on the thousands of patents already granted, is unknown.
This exclusion is imposed at the threshold, before it is determined whether the excluded process is new, non-obvious, enabled, described, particularly claimed, etc.; that is, before the new process is examined for patentability. For example, we do not know whether the Bilski process would be found patentable under the statutory criteria, for they were never applied.
The innovations of the “knowledge economy” — of “digital prosperity” — have been dominant contributors to today’s economic *977 growth and societal change. Revision of the commercial structure affecting major aspects of today’s industry should be approached with care, for there has been significant reliance on the law as it has existed, as many amici curiae pointed out. Indeed, the full reach of today’s change of law is not clear, and the majority opinion states that many existing situations may require reassessment under the new criteria.
Uncertainty is the enemy of innovation. These new uncertainties not only diminish the incentives available to new enterprise, but disrupt the settled expectations of those who relied on the law as it existed. I respectfully dissent.
DISCUSSION
The court’s exclusion of specified process inventions from access to the patent system is achieved by redefining the word “process” in the patent statute. However, the court’s redefinition is contrary to statute and to explicit rulings of the Supreme Court and this court. I start with the statute:

Section 101 is the statement of statutory eligibility

From the first United States patent act in 1790, the subject matter of the “useful arts” has been stated broadly, lest advance restraints inhibit the unknown future. The nature of patent-eligible subject matter has received judicial attention over the years, as new issues arose with advances in science and technology. The Supreme Court has consistently confirmed the constitutional and legislative purpose of providing a broadly applicable incentive to commerce and creativity, through this system of limited exclusivity. Concurrently, the Court early explained the limits of patentable subject matter, in that “fundamental truths” were not intended to be included in a system of exclusive rights, for they are the general foundations of knowledge. Thus laws of nature, natural phenomena, and abstract ideas are not subject to patenting. Several rulings of the Court have reviewed patent eligibility in light of these fundamentals. However, the Court explicitly negated today’s restrictions. My colleagues in the majority are mistaken in finding that decisions of the Court require the per se limits to patent eligibility that the Federal Circuit today imposes. The patent statute and the Court’s decisions neither establish nor support the exclusionary criteria now adopted.
The court today holds that any process that does not transform physical matter or require performance by machine is not within the definition of “process” in any of the patent statutes since 1790. All of the statutes contained a broad definition of patent-eligible subject matter, like that in the current Patent Act of 1952:
35 U.S.C § 101 Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
In Diamond v. Diehr, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) the Court explained that Section 101 is not an independent condition of patentability, but a general statement of subject matter eligibility. The Court stated:
Section 101, however, is a general statement of the type of subject matter that is eligible for patent protection “subject to the conditions and requirements of this title.” Specific conditions for pat-entability follow and § 102 covers in detail the conditions relating to novelty. The question therefore of whether a particular invention is novel is “wholly apart *978 from whether the invention falls in a category of statutory subject matter.”
Id. at 189-90, 101 S.Ct. 1048 (footnote omitted) (quoting In re Bergy, 596 F.2d 952, 961 (C.C.P.A.1979)).
“Process” is defined in the 1952 statute as follows:
35 U.S.C. § 100(b) The term “process” means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.
The 1952 Patent Act replaced the word “art” in prior statutes with the word “process,” while the rest of Section 101 was unchanged from earlier statutes. The legislative history for the 1952 Act explained that “art” had been “interpreted by courts to be practically synonymous with process or method.” S.Rep. No. 82-1979 (1952), reprinted in 1952 U.S.C.C.A.N. 2394, 2398, 2409-10. In Diehr the Court explained that a process “has historically enjoyed patent protection because it was considered a form of ‘art’ as that term was used in the 1793 Act.” 450 U.S. at 182, 101 S.Ct. 1048.
The definition of “process” provided at 35 U.S.C. § 100(b) is not “unhelpful,” as this court now states, maj. op. at 951 n. 3, but rather points up the errors in the court’s new statutory interpretation. Section 100(b) incorporates the prior usage “art” and the term “method,” and places no restriction on the definition. This court’s redefinition of “process” as limiting access to the patent system to those processes that use specific machinery or that transform matter, is contrary to two centuries of statutory definition.
The breadth of Section 101 and its predecessor provisions reflects the legislative intention to accommodate not only known fields of creativity, but also the unknown future. The Court has consistently refrained from imposing unwarranted restrictions on statutory eligibility, and for computer-implemented processes the Court has explicitly rejected the direction now taken. Nonetheless, this court now adopts a redefinition of “process” in Section 101 that excludes forms of information-based and software-implemented inventions arising from new technological capabilities, stating that this result is required by the Court’s computer-related cases, starting with Gottschalk v. Benson, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). However, the Court in Benson rejected the restriction that is imposed today:

This court’s new definition of “process” was rejected in Gottschalk v. Benson

In Benson the claimed invention was a mathematical process for converting binary-coded decimal numerals into pure binary numbers. The Court explained that a mathematical formula unlimited to a specific use was simply an abstract idea of the nature of “fundamental truths,” “phenomena of nature,” and “abstract intellectual concepts,” as have traditionally been outside of patent systems. 409 U.S. at 67, 93 S.Ct. 253. However, the Court explicitly declined to limit patent-eligible processes in the manner now adopted by this court, stating:
It is argued that a process patent must either be tied to a particular machine or apparatus or must operate to change articles or materials to a “different state or thing.” We do not hold that no process patent could ever qualify if it did not meet the requirements of our prior precedents. It is said that the decision precludes a patent for any program servicing a computer. We do not so hold.
Id. at 71, 93 S.Ct. 253. The Court explained that “the requirements of our prior precedents” did not preclude patents on computer programs, despite the statement *979 drawn from Cochrane v. Deener, 94 U.S. 780, 787-88, 24 L.Ed. 139 (1876), that “[transformation and reduction of an article ‘to a different state or thing’ is the clue to the patentability of a process claim that does not include particular machines.” Benson, 409 U.S. at 70, 93 S.Ct. 253. Although this same statement is now relied upon by this court as requiring its present ruling, maj. op at 956 & n. 11, the Court in Benson was explicit that: “We do not hold that no process patent could ever qualify if it did not meet [the Court’s] prior precedents.” The Court recognized that Coch-rane’s statement was made in the context of a mechanical process and a past era, and protested:
It is said we freeze process patents to old technologies, leaving no room for the revelations of the new, onrushing technology. Such is not our purpose.
Benson, 409 U.S. at 71, 93 S.Ct. 253. Instead, the Court made clear that it was not barring patents on computer programs, and rejected the “argu[ment] that a process patent must either be tied to a particular machine or apparatus or must operate to change articles or materials to a ‘different state or thing’ ” in order to satisfy Section 101. Id. Although my colleagues now describe these statements as “equivocal,” maj. op. at 956, there is nothing equivocal about “We do not so hold.” Benson, 409 U.S. at 71, 93 S.Ct. 253. Nonetheless, this court now so holds.

In Parker v. Flook the Court again rejected today’s restrictions

The eligibility of mathematical processes next reached the Court in Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), where the Court held that the “process” category of Section 101 was not met by a claim to a mathematical formula for calculation of alarm limits for use in connection with catalytic conversion of hydrocarbons and, as in Benson, the claim was essentially for the mathematical formula. The Court later summarized its Flook holding, stating in Diamond v. Diehr that:
The [Flook] application, however, did not purport to explain how these other variables were to be determined, nor did it purport “to contain any disclosure relating to the chemical processes at work, the monitoring of the process variables, nor the means of setting off an alarm or adjusting an alarm system. All that it provides is a formula for computing an updated alarm limit.”
Diehr, 450 U.S. at 186-87, 101 S.Ct. 1048 (quoting Flook, 437 U.S. at 586, 98 S.Ct. 2522).
The Court explained in Flook that a field-of-use restriction to catalytic conversion did not distinguish Flook’s mathematical process from that in Benson. However, the Court reiterated that patent eligibility of computer-directed processes is not controlled by the “qualifications of our earlier precedents,” again negating any limiting effect of the usages of the past, on which this court now places heavy reliance. The Court stated: *980 Flook, 437 U.S. at 589 n. 9, 98 S.Ct. 2522 (quoting Cochrane, 94 U.S. at 787). This statement directly contravenes this court’s new requirement that all processes must meet the court’s “machine-or-transformation test” or be barred from access to the patent system.
*979 The statutory definition of “process” is broad. An argument can be made, however, that this Court has only recognized a process as within the statutory definition when it either was tied to a particular apparatus or operated to change materials to a “different state or thing.” As in Benson, we assume that a valid process patent may issue even if it does not meet one of these qualifications of our earlier precedents[1]
*980 The Court in Flook discussed that abstractions and fundamental principles have never been subject to patenting, but recognized the “unclear line” between an abstract principle and the application of such principle:
The line between a patentable “process” and an unpatentable “principle” is not always clear. Both are “conception^] of the mind, seen only by [their] effects when being executed or performed.”
Flook, 437 U.S. at 589, 98 S.Ct. 2522 (alterations in original) (quoting Tilghman v. Proctor, 102 U.S. 707, 728, 26 L.Ed. 279 (1880)).
The decision in Flook has been recognized as a step in the evolution of the Court’s thinking about computers. See Arrhythmia Res. Tech., Inc. v. Corazonix Corp., 958 F.2d 1053, 1057 n. 4 (Fed.Cir. 1992) (“it appears to be generally agreed that these decisions represent evolving views of the Court”) (citing R.L. Gable & J.B. Leaheey, The Strength of Patent Protection for Computer Products, 17 Rutgers Computer & Tech. L.J. 87 (1991); D. Chi-sum, The Patentability of Algorithms, 47 U. Pitt. L.Rev. 959 (1986)). That Flook does not support today’s per se exclusion of forms of process inventions from access to the patent system is reinforced in the next Section 101 case decided by the Court:

In Diamond v. Chakrabarty the Court again rejected per se exclusions of subject matter from Section 101

In Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), the scope of Section 101 was challenged as applied to the new fields of biotechnology and genetic engineering, with respect to the patent eligibility of a new bacterial “life form.” The Court explained the reason for the broad terms of Section 101:
The subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting “the Progress of Science and the useful Arts” with all that means for the social and economic benefits envisioned by Jefferson. Broad general language is not necessarily ambiguous when congressional objectives require broad terms.
Id. at 315, 100 S.Ct. 2204 (quoting U.S. Const., art. I, § 8). The Court referred to the use of “any” in Section 101 (“Whoever invents or discovers any new and useful process ... or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title”), and reiterated that the statutory language shows that Congress “plainly contemplated that the patent laws would be given wide scope.” Id. at 308, 100 S.Ct. 2204. The Court referred to the legislative intent to include within the scope of Section 101 “anything under the sun that is made by man,” id. at 309, 100 S.Ct. 2204 (citing S. Rep. 82-1979, at 5, U.S.Code Cong. & Admin.News 1952, pp. 2394, 2399; H.R. Rep. 82-1923, at 6 (1952)), and stated that the unforeseeable future should not be inhibited by judicial restriction of the “broad general language” of Section 101:
A rule that unanticipated inventions are without protection would conflict with the core concept of the patent law that anticipation undermines patentability. Mr. Justice Douglas reminded that the *981 inventions most benefiting mankind are those that push back the frontiers of chemistry, physics, and the like. Congress employed broad general language in drafting § 101 precisely because such inventions are often unforeseeable.
Id. at 315-16, 100 S.Ct. 2204 (citations and internal quotation marks omitted). The Court emphasized that its precedents did not alter this understanding of Section 101’s breadth, stating that “Flook did not announce a new principle that inventions in areas not contemplated by Congress when the patent laws were enacted are unpatentable per se.” Id. at 315, 100 S.Ct. 2204.
Whether the applications of physics and chemistry that are manifested in advances in computer hardware and software were more or less foreseeable than the advances in biology and biotechnology is debatable, but it is not debatable that these fields of endeavor have become primary contributors to today’s economy and culture, as well as offering an untold potential for future advances. My colleagues offer no reason now to adopt a policy of exclusion of the unknown future from the subject matter now embraced in Section 101.
Soon after Chakrabarty was decided, the Court returned to patentability issues arising from computer capabilities:

In Diamond v. Diehr the Court directly held that computer-implemented processes are included in Section 101

The invention presented to the Court in Diehr was a “physical and chemical process for molding precision synthetic rubber products” where the process steps included using a mathematical formula. The Court held that the invention fit the “process” category of Section 101 although mathematical calculations were involved, and repeated its observation in Chakrabarty that “courts should not read into the patent laws limitations and conditions which the legislature has not expressed.” Diehr, 450 U.S. at 182, 101 S.Ct. 1048 (internal quotation marks omitted) (citing Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204).
The Court distinguished a claim that would cover all uses of a mathematical formula and thus is an abstract construct, as in Benson, from a claim that applies a mathematical calculation for a specified purpose, as in Diehr. The Court stated that “a claim drawn to subject matter otherwise statutory does not become nonstat-utory simply because it uses a mathematical formula, computer program, or digital computer,” id. at 187, 101 S.Ct. 1048, and explained that the line between statutory and nonstatutory processes depends on whether the process is directed to a specific purpose, see id. (“It is now commonplace that an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.” (emphasis in original)). The Court clarified that Flook did not hold that claims may be dissected into old and new parts to assess their patent eligibility. Id. at 189 n. 12, 101 S.Ct. 1048.
However, the Court did not propose the “machine-or-transformation” test that this court now insists was “enunciated” in Diehr as a specific limit to Section 101. Maj. op. at 953-54. In Diehr there was no issue of machine or transformation, for the Diehr process both employed a machine and produced a chemical transformation: the process was conducted in “an openable rubber molding press,” and it cured the rubber. In discussing the known mathematical formula used by Diehr to calculate the relation between temperature and the rate of a chemical reaction, the Court recited the traditional exceptions of “laws of nature, natural phenomena, and abstract ideas,” 450 U.S. at 185, 101 S.Ct. 1048, and explained that the entirety of the process *982 must be considered, not an individual mathematical step.
The Court characterized the holdings in Benson and Flook as standing for no more than the continued relevance of these “long-established” judicial exclusions, id., and repeated that a practical application of pure science or mathematics may be patentable, citing Mackay Radio & Telegraph Co. v. Radio Corp. of America, 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939) (“While a scientific truth, or the mathematical expression of it, is not a patentable invention, a novel and useful structure created with the aid of knowledge and scientific truth may be.”). The Court explained that the presence of a mathematical formula does not preclude patentability when the structure or process is performing a function within the scope of the patent system, stating:
[Wjhen a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect {e.g., transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101.
450 U.S. at 192, 101 S.Ct. 1048. This statement’s parenthetical “e.g.” is relied on by the majority for its statement that Diehr requires today’s “machine-or-transformation” test. However, this “e.g.” does not purport to state the only “function which the patent laws were designed to protect.” Id. This “e.g.” indeed describes the process in Diehr, but it does not exclude all other processes from access to patenting.
It cannot be inferred that the Court intended, by this “e.g.” parenthetical, to require the far-reaching exclusions now attributed to it. To the contrary, the Court in Diehr was explicit that “an application of a law of nature or mathematical formula” may merit patent protection, 450 U.S. at 187, 101 S.Ct. 1048 (emphasis in original), and that the claimed process must be considered as a whole, id. at 188, 101 S.Ct. 1048. The Court recognized that a process claim may combine steps that were separately known, and that abstract ideas such as mathematical formulae may be combined with other steps to produce a patentable process. Id. at 187, 101 S.Ct. 1048. The steps are not to be “dissected]” into new and old steps; it is the entire process that frames the Section 101 inquiry. Id. at 188,101 S.Ct. 1048.
The Diehr Court did not hold, as the majority opinion states, that transformation of physical state is a requirement of eligibility set by Section 101 unless the process is performed by a machine. It cannot be inferred that the Court silently imposed such a rule. See maj. op. at 956 (relying on lack of repetition in Diehr of the Benson and Flook disclaimers of requiring machine or transformation, as an implicit rejection of these disclaimers and tacit adoption of the requirement). There was no issue in Diehr of the need for either machine or transformation, for both were undisputedly present in the process of curing rubber. It cannot be said that the Court “enunciated” today’s “definitive test” in Diehr.[2]

*983
Subsequent Supreme Court authority reinforced the breadth of Section 101

In J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc., 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001), the Court described Section 101 as a “dynamic provision designed to encompass new and unforeseen inventions,” id. at 135, 122 S.Ct. 593, that case arising in the context of eligibility of newly developed plant varieties for patenting. The Court stated: “As in Chakrabarty, we decline to narrow the reach of § 101 where Congress has given us no indication that it intends this result.” Id. at 145-46, 122 S.Ct. 593. The Court reiterated that “Congress plainly contemplated that the patent laws would be given wide scope,” id. at 130, 122 S.Ct. 593 (quoting Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204), and that the language of Section 101 is “extremely broad,” id. This is not language of restriction, and it reflects the statutory policy and purpose of inclusion, not exclusion, in Section 101.

The Court’s decisions of an earlier age do not support this court’s restrictions of Section 101

My colleagues also find support for their restrictions on patent-eligible “process” inventions in the pre-Section 101 decisions O’Reilly v. Morse, 56 U.S. (15 How.) 62, 14 L.Ed. 601 (1853), Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1876), and Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880). Although the Court in Benson and in Flook took care to state that these early decisions do not require the restrictions that the Court was rejecting, this court now places heavy reliance on these early decisions, which this court describes as “consistent with the maehine-or-transformation test later articulated in Benson and reaffirmed in Diehr.” Maj. op. at 955. As I have discussed, no such test was “articulated in Benson ” and “reaffirmed in Diehr.”
However, these early cases do show, contrary to the majority opinion, that a “process” has always been a distinct category of patentable invention, and not tied to either apparatus or transformation, as this court now holds. For example, in Tilghman v. Proctor the Court considered a patent on a process for separating fats and oils, and held that the process was not restricted to any particular apparatus. The Court held that a process is an independent category of invention, and stated:
That a patent can be granted for a process, there can be no doubt. The patent law is not confined to new machines and new compositions of matter, but extends to any new and useful art or manufacture.
102 U.S. at 722; see also Corning v. Burden, 56 U.S. (15 How.) 252, 268, 14 L.Ed. 683 (1853) (“It is for the discovery or invention of some practical method or means of producing a beneficial result or effect, that a patent is granted, and not for the result or effect itself.”) The difference between a process and the other categories of patent-eligible subject matter does not deprive process inventions of the independent status accorded by statute, by precedent, and by logic, all of which negate the court’s new rule that a process must be tied to a particular machine or must transform physical matter.
The majority also relies on O'Reilly v. Morse, citing the Court’s rejection of Morse’s Claim 8 for “the use of the motive power of the electro or galvanic current, which I call electromagnetism, however developed, for making or printing intelligible characters, signs or letters at any distances .... ” The Court explained:
In fine he claims an exclusive right to use a manner and process which he has not described and indeed had not invented, and therefore could not describe when he obtained his patent. The Court *984 is of the opinion that the claim is too broad, and not warranted by law.
56 U.S. (15 How.) at 113. However, the claims that were directed to the communication system that was described by Morse were held patentable, although no machine, transformation, or manufacture was required. See Morse’s Claim 5 (“The system of signs, consisting of dots and spaces, and horizontal lines, for numerals, letters, words, or sentences, substantially as herein set forth and illustrated, for telegraphic purposes.”). I cannot discern how the Court’s rejection of Morse’s Claim 8 on what would now be Section 112 grounds, or the allowance of his other claims, supports this court’s ruling today. Indeed, Morse’s claim 5, to a system of signs, is no more “tangible” than the systems held patentable in Alappat and State Street Bank, discussed post and now cast into doubt, or the Bilski system here held ineligible for access to patenting.
The majority opinion also relies on Coch-rane v. Deener, particularly on certain words quoted in subsequent opinions of the Court. In Cochrane the invention was a method for bolting flour, described as a series of mechanical steps in the processing of flour meal. The question before the Court was whether the patented process would be infringed if the same steps were performed using different machinery. The answer was “that a process may be patentable, irrespective of the particular form of the instrumentalities used.” 94 U.S. at 788. The Court stressed the independence of a process from the tools that perform it:
A process is a mode of treatment of certain materials to produce a given result. It is an act, or series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.
94 U.S. at 788. The Court did not restrict the kinds of patentable processes; the issue in Cochrane was whether the process must be tied to the machinery that the patentee used to perform it.
This court now cites Cochrane’s description of a process as “acts performed upon subject-matter to be transformed and reduced to a different state or thing,” id., this court stating that unless there is transformation there is no patentable process. That is not what this passage means. In earlier opinions this court and its predecessor court stated the correct view of this passage, as has the Supreme Court. The Court of Customs and Patent Appeals observed:
[This Cochrane passage] has sometimes been misconstrued as a ‘rule’ or ‘definition’ requiring that all processes, to be patentable, must operate physically on substances. Such a result misapprehends the nature of the passage quoted as dictum, in its context, and the question being discussed by the author of the opinion. To deduce such a rule from the statement would be contrary to its in-tendment which was not to limit process patentability but to point out that a process is not limited to the means used in performing it.
In re Prater, 56 C.C.P.A. 1381, 415 F.2d 1393, 1403 (1969). Again in In re Schrader, 22 F.3d 290, 295 n. 12 (Fed.Cir.1994) this court noted that Cochrane did not limit patent eligible subject matter to *985 physical transformation, and that transformation of “intangibles” could qualify for patenting. In AT & T Corp. v. Excel Communications, Inc., 172 F.3d 1352, 1358 (Fed.Cir.1999), this court described physical transformation as “merely one example of how a mathematical algorithm may bring about a useful application.”
The Court saw the Cochrane decision in its proper perspective. Both Flook and Benson rejected the idea that Cochrane imposed the requirement of either specific machinery or the transformation of matter, as discussed ante. See Flook, 437 U.S. at 588 n. 9, 98 S.Ct. 2522; Benson, 409 U.S. at 71, 93 S.Ct. 253. Non-trans-formative processes were not at issue in either Cochrane or Diehr, and there is no endorsement in Diehr of a “machine-or-transformation” requirement for patentable processes.
These early cases cannot be held now to require exclusion, from the Section 101 definition of “process,” of all processes that deal with data and information, whose only machinery is electrons, photons, or waves, or whose product is not a transformed physical substance.

The English Statute of Monopolies and English common law do not limit “process” in Section 101

I comment on this aspect in view of the proposal in the concurring opinion that this court’s new two-prong test for Section 101 process inventions was implicit in United States law starting with the Act of 1790, because of Congress’s knowledge of and importation of English common law and the English Statute of Monopolies of 1623. The full history of patent law in England is too ambitious to be achieved within the confines of Bilski’s appeal,[3] and the concurring opinion’s selective treatment of this history may propagate misunderstanding.
The concurrence places primary reliance on the Statute of Monopolies, which was enacted in response to the monarchy’s grant of monopolies “to court favorites in goods or businesses which had long before been enjoyed by the public.” Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (citing Peter Meinhardt, Inventions, Patents and Monopoly 30-35 (1946)). The Statute of Monopolies outlawed these “odious monopolies” or favors of the Crown, but, contrary to the concurring opinion, the Statute had nothing whatever to do with narrowing or eliminating categories of inventive subject matter eligible for a British patent. See Prager, Historical Background and Foundation of American Patent Law, 5 Am. J. Legal Hist, at 313 (“The statute [of Monopolies] said nothing about meritorious *986 functions of patents, nothing about patent disclosures, and nothing about patent procedures; it was only directed against patent abuses.”).
Patents for inventions had been granted by the Crown long before 1623. See Hulme, The History of the Patent System Under the Prerogative and at Common Law, 12 L.Q. Rev. at 143 (the first patent grant to the “introducer of a newly-invented process” was in 1440); Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. at 626-27 (discussing first patents for “invention” in England in the fifteenth century). That practice was unaffected by the terms of the Statute of Monopolies, which rendered “utterly void” all “Monopolies and all Commissions, Grants, Licenses, Charters and Letters Patent” that were directed to “the sole Buying, Selling, Making, Working or Using any Thing within this Realm,” 21 Jac. I, c.3, § I (Eng.), but which specifically excepted Letters Patent for inventions from that exclusion, id. § VI. The only new limitation on patents for invention was a fourteen-year limit on the term of exclusivity. See Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. at 649.
The usage “Letters Patent” described one of the forms of document whereby the Crown granted various rights, whether the grant was for an odious monopoly that the Statute of Monopolies eliminated, or for rights to an invention new to England. That usage was not changed by the Statute of Monopolies. Nor were other aspects of the British practice which differed from that enacted in the United States, particularly the aspect whereby a British patent could be granted to a person who imported something that was new to England, whether or not the import was previously known or the importer was the inventor thereof. In England, “[t]he rights of the inventor are derived from those of the importer, and not viee versa as is commonly supposed.” Hulme, The History of the Patent System Under the Prerogative and at Common Law, 12 L.Q.R. at 152; see also MacLeod, Inventing the Industrial Revolution 13 (“The rights of the first inventor were understood to derive from those of the first importer of the invention.”).
In contrast, in the United States the patent right has never been predicated upon importation, and has never been limited to “manufactures.” See, e.g., Walter-scheid, To Promote the Progress of Useful Arts 93, 137-38, 224; see also Prager, Historic Background and Foundation of American Patent Law, 5 Am. J. Legal Hist, at 309 (“The American Revolution destroyed many of the ancient customs; it brought a sweeping reorientation of patent law, with new forms, new rules, new concepts, and new ideals.”). The differences between the American and English patent law at this nation’s founding were marked, and English judicial decisions interpreting the English statute are of limited use in interpreting the United States statute. In all events, no English decision supports this court’s new restrictive definition of “process.”
The concurrence proposes that the Statute of Monopolies provides a binding definition of the terms “manufacture,” “machine,” “composition of matter,” and “process” in Section 101 of the U.S. Patent Act. See concurring op. at 968-70. The only one of these terms that appears in the Statute of Monopolies is “manufacture”, a broad term that reflects the usage of the period. Even at the time of this country’s founding, the usage was broad, as set forth in Samuel Johnson’s Dictionary of the English Language (3d. ed. 1768), which defines “manufacture” as “any thing made by art,” and defines *987 “art” as “the power of doing something not taught by nature and instinct”; “a science”; “a trade”; “artfulness”; “skill”; “dexterity.” Historians explain that England’s primary motive for patenting was to promote “[a]cquisition of superior Continental technology” at a time when England lagged behind, see MacLeod, Inventing the Industrial Revolution 11; this cannot be interpreted to mean that England and perforce the United States intended to eliminate “processes” from this incentive system. It is inconceivable that on this background the Framers, and again the enactors of the first United States patent statutes in 1790 and 1793, intended sub silentio to impose the limitations on “process” now created by this court.
Congress’ earliest known draft patent bill included the terms “art, manufacture, engine, machine, invention or device, or any improvement upon the same.” Wal-terscheid, To Promote the Progress of Useful Arts 92. The 1793 Act explicitly stated “any new and useful art,” § 1, 1 Stat. 318 (1793), a usage that was carried forward until “art” was replaced with “process” in 35 U.S.C. § 101 and defined in § 100(b). Historians discuss that Congress’ inclusion of any “art” or “process” in the patent system was a deliberate clarification of the English practice. See Walterscheid, To Promote the Progress of Useful Arts 93 (“[The first patent bill] appears to be an obvious attempt to deal legislatively with issues that were beginning to be addressed by the English courts---- [I]t states unequivocally that improvement inventions are patentable and expands the definition of invention or discovery beyond simply ‘manufacture.’ ”); Karl B. Lutz, Patents and Science: A Clarification of the Patent Clause of the U.S. Constitution, 32 J.P.O.S. 83, 86 (1950) (“By the year 1787 it was being recognized even in Great Britain that the phrase ‘new manufactures’ was an unduly limited object for a patent system, since it seems to exclude new processes.... [This question was] resolved in the United States Constitution by broadening the field from ‘new manufactures’ to ‘useful arts’.... ”).
In interpreting a statute, it is the language selected by Congress that occupies center stage: “[0]ur obligation is to take statutes as we find them, guided, if ambiguity appears, by the legislative history and statutory purpose.” Chakrabarty, 447 U.S. at 315, 100 S.Ct. 2204. The Court has “perceive[d] no ambiguity” in Section 101, leaving no need for foreign assistance. Id. The legislative choice to afford the patent system “wide scope,” id. at 308, 100 S.Ct. 2204, including “process” inventions, evolved in the United States independent of later developments of the common law in England.
The concurrence concludes that the Statute of Monopolies foreclosed the future patenting of anything that the concurrence calls a “business method” — the term is not defined — whether or not the method is new, inventive, and useful. But the Statute of Monopolies only foreclosed “odious” monopolies, illustrated by historical reports that Queen Elizabeth had granted monopolies on salt, ale, saltpeter, white soap, dredging machines, playing cards, and rape seed oil, and on processes and services such as Spanish leather-making, mining of various metals and ores, dying and dressing cloth, and iron tempering. See Walterscheid, Early Evolution (Part 2), 76 J.P.T.O.S. at 854 n.14; Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. at 634-35. These and other grants, many of which were implemented by Letters Patent, were the “odious monopolies” that were rendered illegal. They included several classes of known activity, product and process, and had nothing to do with new “inventions.” *988 The Statute of Monopolies cannot be held to have restricted the kinds of new processes that can today be eligible for patenting in the United States, merely because it outlawed patents on non-novel businesses in England. The presence or absence of “organizing human activity,” a vague term created by the concurrence, has no connection or relevance to Parliament’s elimination of monopoly patronage grants for old, established arts. The Statute of Monopolies neither excluded nor included inventions that involve human activity, although the words “the sole working or making in any manner of new manufactures” presuppose human activity. 21 Jac. 1, c.3, § VI (emphases added). We are directed to no authority for the proposition that a new and inventive process involving “human activity” has historically been treated differently from other processes; indeed, most inventions involve human activity.
The concurrence has provided hints of the complexity of the evolution of patent law in England, as in the United States, as the Industrial Revolution took hold. Historians have recognized these complexities. See, e.g., Walterscheid, To Promote the Progress of Useful Arts 5 (“[T]he American patent law almost from its inception departed from its common law counterpart in the interpretation that would be given to the definition of novelty....”); Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. at 638 (noting that in Elizabethan times, novelty only required a showing that “the industry had not been carried on within the realm within a reasonable period of time”, while today “the proof of a single public sale of an article” or a “printed publication” can negate pat-entability).
I caution against over-simplification, particularly in view of the uncertainties in English common law at the time of this country’s founding. See Boulton v. Bull, 2 H. Bl. 463, 491 (C.P.1795) (Eyre, C.J.) (“Patent rights are no where that I can find accurately discussed in our books.”); MacLeod, Inventing the Industrial Revolution 61 (“It was only from the time when the Privy Council relinquished jurisdiction that a case law on patents began to develop.... But it was a slow process and even the spate of hard-fought patent cases at the end of the eighteenth century did little to establish a solid core of judicial wisdom.”). The English judicial opinions of the eighteenth century were not as limiting on the United States as my colleagues suggest. See Walterscheid, The Nature of the Intellectual Property Clause: A Study in Historical Perspective 355 (2002) (“In the eighteenth century, patentees and those who gave advice concerning patents were certainly of the view that the Statute did not preclude the patenting of general principles of operation.”); see also Mac-Leod, Inventing the Industrial Revolution 63-64.
It is reported that in the century and a half following enactment of the Statute of Monopolies, the English patent registers were replete with inventions claimed as “processes.” See Walterscheid, Early Evolution (Part 3), 77 J.P.T.O.S. at 856 (“As one of the earliest texts on the patent law stated in 1806: “most of the patents now taken out, are by name, for the method of doing particular things.... ”). The concurrence agrees; but it is also reported that because patents were not litigated in the common law courts until the Privy Council authorized such suits in 1752, judicial interpretation of various aspects of patent law were essentially absent until about the time this country achieved independence, leading to the variety of views expressed in Boulton v. Bull. The legislators in the new United States cannot now be assigned the straightjacket of law not yet developed in England. Indeed, the *989 first patent granted by President Washington, upon examination by Secretary of State Jefferson, was for a method of “making Pot-ash and Pearl-ash,” a process patent granted during the period that the concurrence states was fraught with English uncertainty about process patents. See The First United States Patent, 36 J.P.O.S. 615, 616-17 (1954).
The concurrence lists some English process patents predating the United States’ 1793 Patent Act, and argues that processes not sufficiently “like” these archaic inventions should not now be eligible for patenting. I refer simply to Flook, 437 U.S. at 588 n. 9, 98 S.Ct. 2522, where the Court stated: “As in Benson, we assume that a valid process patent may issue even if it does not meet one of the qualifications of our earlier precedents.” Similarly, the Chakrabarty Court stated: “[A] statute is not to be confined to the particular applications ... contemplated by the legislators. This is especially true in the field of patent law.” Chakrabarty, 447 U.S. at 315-16, 100 S.Ct. 2204 (citing Barr v. United States, 324 U.S. 83, 90, 65 S.Ct. 522, 89 L.Ed. 765 (1945); Browder v. United States; 312 U.S. 335, 339, 61 S.Ct. 599, 85 L.Ed. 862 (1941); Puerto Rico v. Shell Co., 302 U.S. 253, 257, 58 S.Ct. 167, 82 L.Ed. 235 (1937)). The meaning of the statutory term “process” is not limited by particular examples from more than two hundred years ago.
However, I cannot resist pointing to the “business method” patents on Woodcroft’s list. See concurring op. at 973 (citing No. 1197 to John Knox (July 21, 1778) (“Plan for assurances on lives of persons from 10 to 80 years of age.”)). Several other process patents on Woodcroft’s list appear to involve financial subject matter, and to require primarily human activity. See, e.g., No. 1170 to John Molesworth (Sept. 29, 1777) (“Securing to the purchasers of shares and chances of state-lottery tickets any prize drawn in their favor.”); No. 1159 to William Nicholson (July 14, 1777) (“Securing the property of persons purchasing shares of State-lottery tickets.”), cited in Bennet Woodcroft, Alphabetical Index of Patentees of Inventions 383, 410 (U.S. ed.1969). Other English process patents from the several decades following 1793 can aptly be described as “business methods,” although not performed with the aid of computers. E.g., No. 10,367 to George Robert D’Harcourt (Oct. 29, 1844) (“Ascertaining and checking the number of checks or tickets which have been used and marked, applicable for railway officers.”).
While most patents of an earlier era reflect the dominant mechanical and chemical technologies of that era, modern processes reflect the dramatic advances in telecommunications and computing that have occurred since the time of George III. See USPTO White Paper, Automated Financial or Management Data Processing Methods (Business Methods) 4 (2000), available at http://www.uspto.gov/web/ menu/busmethp/whitepaper.pdf (hereinafter USPTO White Paper) (“The full arrival of electricity as a component in business data processing systemfs] was a watershed event.”). It is apparent that economic, or “business method,” or “human activity” patents were neither explicitly nor implicitly foreclosed from access to the English patent system.

Evolution of process patents in the United States

The United States’ history of patenting establishes the same point. The PTO has located various patents predating modern computer usages that can be described as financial or business methods. The USP-TO White Paper at 3-4 and appendix A describes the history of financial apparatus and method patents dating back to 1799, including patents on bank notes, bills of *990 credit, bills of exchange, check blanks, detecting and preventing counterfeiting, coin counting, interest calculation tables, and lotteries, all within the first fifty years of the United States patent system. It is a distortion of these patents to describe the processes as “tied to” another statutory category — that is, paper and pencil. Concurring op. at 974-75 & n. 18. Replacement of paper with a computer screen, and pencil with electrons, does not “untie” the process. Fairly considered, the many older financial and business-oriented patents that the PTO and many of the amici have identified are of the same type as the Bilski claims; they were surely not rendered patent-eligible solely because they used “paper” to instantiate the financial strategies and transactions that comprised their contribution.
I do not disagree with the general suggestion that statutes intended to codify the existing common law are to be interpreted in light of then-contemporary practice, including, if relevant, the English cases. See concurring op. at 972-73. However, the court must be scrupulous in assessing the relevance of decisions that were formulated on particularized facts involving the technology of the period. The United States Supreme Court has never held that “process” inventions suffered a second-class status under our statutes, achieving patent eligibility only derivatively through an explicit “tie” to another statutory category. The Court has repeatedly disparaged efforts to read in restrictions not based on statutory language. See Diehr, 450 U.S. at 182, 101 S.Ct. 1048; Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204. Yet second-class status is today engrafted on “process” inventions. There is plainly no basis for such restriction, which is a direct path to the “gloomy thought” that concerned Senator O.H. Platt in his Remarks in Congress at the Centennial Proceedings of the United States Patent System:
For one, I cannot entertain the gloomy thought that we have come to that century in the world’s life in which new and grander achievements are impossible.... Invention is a prolific mother; every inventive triumph stimulates new effort. Man never is and never will be content with success, and the great secrets of nature are as yet largely undiscovered.
Invention and Advancement (1891), reprinted in United States Bicentennial Commemorative Edition of Proceedings and Addresses: Celebration of the Beginning of the Second Century of the American Patent System 75-76 (1990).
In sum, history does not support the retrogression sponsored by the concurrence.

This court now rejects its own CCPA and Federal Circuit precedent

The majority opinion holds that there is a Supreme Court restriction on process patents, “enunciated” in Benson, Flook, and Diehr; and that this restriction was improperly ignored by the Federal Circuit and the Court of Customs and Patent Appeals, leading us into error which we must now correct. Thus this court announces that our prior decisions may no longer be relied upon. Maj. op. at 959-60 & nn. 17, 19. The effect on the patents and businesses that did rely on them is not considered.
The Court’s decisions in Benson, Flook, and Diehr all reached the Supreme Court by way of the CCPA, and the CCPA successively implemented the Court’s guidance in establishing the Freeman/Walter/Abele test for eligibility under Section 101. The Federal Circuit continued to consider computer-facilitated processes, as in Arrhythmia Research Technology, 958 F.2d at 1059-60, where patent-eligibility was confirmed for a computer-assisted *991 mathematical analysis of electrocardiograph signals that determined the likelihood of recurrence of heart attack. This court now rules that this precedent “should no longer be relied on.” Maj. op. at 959 n. 17.
In In re Alappat, 33 F.3d 1526 (Fed.Cir. 1994) (en banc) the question was the eligibility for patent of a rasterizer that mathematically transforms data to eliminate aliasing in a digital oscilloscope. The court held that a computer-implemented system that produces a “useful, concrete, and tangible result” is Section 101 subject matter. Id. at 1544. This court now rules that “a ‘useful, concrete and tangible result’ analysis should no longer be relied on.” Maj. op. at 960 n. 19.
The Alappat court stressed the intent, embodied in the language of the statute, that the patent system be broadly available to new and useful inventions:
The use of the expansive term “any” in § 101 represents Congress’s intent not to place any restrictions on the subject matter for which a patent may be obtained beyond those specifically recited in § 101 and other parts of Title 35.
33 F.3d at 1542. This court looked to the Supreme Court’s guidance in its Section 101 decisions, and explained:
A close analysis of Diehr, Flook, and Benson reveals that the Supreme Court never intended to create an overly broad, fourth category of [mathematical] subject matter excluded from § 101. Rather, at the core of the Court’s analysis in each of these cases lies an attempt by the Court to explain a rather straightforward concept, namely, that certain types of mathematical subject matter, standing alone, represent nothing more than abstract ideas until reduced to some type of practical application, and thus that subject matter is not, in and of itself, entitled to patent protection.
Id. at 1543 (emphasis in original). The court cited the Supreme Court’s distinction between abstract ideas and their practical application, and stated of the claimed rast-erizer: “This is not a disembodied mathematical concept which may be characterized as an ‘abstract idea,’ but rather a specific machine to produce a useful, concrete, and tangible result.” Id. at 1544.
This principle was applied to a computer-implemented data processing system for managing pooled mutual fund assets in State Street Bank & Trust Co. v. Signature Financial Group, Inc., 149 F.3d 1368 (Fed.Cir.1998), and to a method for recording and processing telephone data in AT & T v. Excel. The court explained that processes that include mathematical calculations in a practical application can produce a useful, concrete, and tangible result, which in State Street Bank was “expressed in numbers, such as price, profit, percentage, cost, or loss.” 149 F.3d at 1375. In AT & T v. Excel the court applied State Street Bank and Diehr, and stated that “physical transformation ... is not an invariable requirement, but merely one example of how a mathematical algorithm may bring about a useful application” and thus achieve a useful, concrete, and tangible result. 172 F.3d at 1358. This analysis, too, can no longer be relied on. Maj. op. at 960 n. 19.
The now-discarded criterion of a “useful, concrete, and tangible result” has proved to be of ready and comprehensible applicability in a large variety of processes of the information and digital ages. The court in State Street Bank reinforced the thesis that there is no reason, in statute or policy, to exclude computer-implemented and information-based inventions from access to patentability. The holdings and reasoning of Alappat and State Street Bank guided *992 the inventions of the electronic age into the patent system, while remaining faithful to the Diehr distinction between abstract ideas such as mathematical formulae and their application in a particular process for a specified purpose. And patentability has always required compliance with all of the requirements of the statute, including novelty, non-obviousness, utility, and the provisions of Section 112.

The public has relied on the rulings of this court and of the Supreme Court

The decisions in Alappat and State Street Bank confirmed the patent eligibility of many evolving areas of commerce, as inventors and investors explored new technological capabilities. The public and the economy have experienced extraordinary advances in information-based and computer-managed processes, supported by an enlarging patent base. The PTO reports that in Class 705, the examination classification associated with “business methods” and most likely to receive inventions that may not use machinery or transform physical matter, there were almost 10,000 patent applications filed in FY 2006 alone, and over 40,000 applications filed since FY 98 when State Street Bank was decided. See Wynn W. Coggins, USPTO, Update on Business Methods for the Business Methods Partnership Meeting 6 (2007) (hereinafter “PTO Report"), available at http:// www.uspto.gov/web/menu/pbmethod/ partnership.pps. An amicus in the present case reports that over 15,000 patents classified in Class 705 have issued. See Br. of Amicus Curiae Accenture, at 22 n.20.[4] The industries identified with information-based and data-handling processes, as several amici curiae explain and illustrate, include fields as diverse as banking and finance, insurance, data processing, industrial engineering, and medicine.
Stable law, on which industry can rely, is a foundation of commercial advance into new products and processes. Inventiveness in the computer and information services fields has placed the United States in a position of technological and commercial preeminence. The information technology industry is reported to be “the key factor responsible for reversing the 20-year productivity slow-down from the mid-1970s to the mid-1990s and in driving today’s robust productivity growth.” R.D. Atkinson & A.S. McKay, Digital Prosperity: Understanding the Economic Benefits of the Information Technology Revolution 10 (Info. Tech. & Innovation Found.2007), available at http://www.itif.org/files/ digital_prosperity.pdf. By revenue estimates, in 2005 the software and information sectors constituted the fourth largest industry in the United States, with significantly faster growth than the overall U.S. economy. Software & Info. Indus. Ass’n, Software and Information: Driving the Knowledge Economy 7-8 (2008), http:// www.siia.net/estore/globecon-08.pdf. A Congressional Report in 2006 stated:
As recently as 1978, intangible assets, such as intellectual property, accounted for 20 percent of corporate assets with the vast majority of value (80 percent) attributed to tangible assets such as facilities and equipment. By 1997, the trend reversed; 73 percent of corporate assets were intangible and only 27 percent were tangible.
H.R.Rep. No. 109-673 (accompanying a bill concerning judicial resources).
This powerful economic move toward “intangibles” is a challenge to the backward-looking change of this court’s ruling *993 today. Until the shift represented by today’s decision, statute and precedent have provided stability in the rapidly moving and commercially vibrant fields of the Information Age. Despite the economic importance of these interests, the consequences of our decision have not been considered. I don’t know how much human creativity and commercial activity will be devalued by today’s change in law; but neither do my colleagues.
The Section 101 interpretation that is now uprooted has the authority of years of reliance, and ought not be disturbed absent the most compelling reasons. “Considerations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what [the courts] have done.” Shepard v. United States, 544 U.S. 13, 23, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 172-73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); see also Hilton v. S.C. Pub. Railways Comm’n, 502 U.S. 197, 205, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (in cases of statutory interpretation the importance of adhering to prior rulings is “most compelling”). Where, as here, Congress has not acted to modify the statute in the many years since Diehr and the decisions of this court, the force of stare decisis is even stronger. See Shepard, 544 U.S. at 23, 125 S.Ct. 1254.
Adherence to settled law, resulting in settled expectations, is of particular importance “in cases involving property and contract rights, where reliance interests are involved.” Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); see also United States v. Title Ins. & Trust Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) (declining to overrule precedent where prior ruling “has become a rule of property, and to disturb it now would be fraught with many injurious results”). This rationale is given no weight by my colleagues, as this court gratuitously disrupts decades of law underlying our own rulings. The only announced support for today’s change appears to be the strained new reading of Supreme Court quotations. But this court has previously read these decades-old opinions differently, without objection by either Congress or the Court. My colleagues do not state a reason for their change of heart. See Benjamin N. Cardozo, The Nature of the Judicial Process 149 (1921) (“[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one’s own course of bricks on the secure foundation of the courses laid by others who had gone before him.”).
It is the legislature’s role to change the law if the public interest so requires. In Chakrabarty the Court stated: “The choice we are urged to make is a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot.” 447 U.S. at 317, 100 S.Ct. 2204; see also Flook, 437 U.S. at 595, 98 S.Ct. 2522 (“Difficult questions of policy concerning the kinds of programs that may be appropriate for patent protection and the form and duration of such protection can be answered by Congress on the basis of current empirical data not equally available to this tribunal.”).
It is, however, the judicial obligation to assure a correct, just, and reliable judicial process, and particularly to respect the principles of stare decisis in an area in which prior and repeated statutory interpretations have been relied upon by others. See, e.g., Shepard, 544 U.S. at 23, 125 *994 S.Ct. 1254 (“[T]he claim to adhere to case law is generally powerful once a decision has settled statutory meaning.”); Hilton, 502 U.S. at 202, 112 S.Ct. 560 (“Adherence to precedent promotes stability, predictability, and respect for judicial authority.”); Payne, 501 U.S. at 827, 111 S.Ct. 2597 (“Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.”). These considerations appear to be abandoned.

Uncertain guidance for the future

Not only past expectations, but future hopes, are disrupted by uncertainty as to application of the new restrictions on patent eligibility. For example, the court states that even if a process is “tied to” a machine or transforms matter, the machine or transformation must impose “meaningful limits” and cannot constitute “insignificant extra-solution activity”. Maj. op. at 961-62. We are advised that transformation must be “central to the purpose of the claimed process,” id., although we are not told what kinds of transformations may qualify, id. at 962-63. These concepts raise new conflicts with precedent.
This court and the Supreme Court have stated that “there is no legally recognizable or protected ‘essential’ element, ‘gist’ or ‘heart’ of the invention in a combination patent.” Allen Eng’g Corp. v. Bartell Industries, Inc., 299 F.3d 1336, 1345 (Fed. Cir.2002) (quoting Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 345, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)). This rule applies with equal force to process patents, see W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 1548 (Fed.Cir.1983) (there is no gist of the invention rule for process patents), and is in accord with the rule that the invention must be considered as a whole, rather than “dissected,” in assessing its patent eligibility under Section 101, see Diehr, 450 U.S. at 188, 101 S.Ct. 1048. It is difficult to predict an adjudicator’s view of the “invention as a whole,” now that patent examiners and judges are instructed to weigh the different process components for their “centrality” and the “significance” of their “extra-solution activity” in a Section 101 inquiry.
As for whether machine implementation will impose “meaningful limits in a particular case,” the “meaningfulness” of computer usage in the great variety of technical and informational subject matter that is computer-facilitated is apparently now a flexible parameter of Section 101. Each patent examination center, each trial court, each panel of this court, will have a blank slate on which to uphold or invalidate claims based on whether there are sufficient “meaningful limits”, or whether a transformation is adequately “central,” or the “significance” of process steps. These qualifiers, appended to a novel test which itself is neither suggested nor supported by statutory text, legislative history, or judicial precedent, raise more questions than they answer. These new standards add delay, uncertainty, and cost, but do not add confidence in reliable standards for Section 101.
Other aspects of the changes of law also contribute uncertainty. We aren’t told when, or if, software instructions implemented on a general purpose computer are deemed “tied” to a “particular machine,” for if Alappat’s guidance that software converts a general purpose computer into a special purpose machine remains applicable, there is no need for the present ruling. For the thousands of inventors who obtained patents under the court’s now-dis *995 carded criteria, their property rights are now vulnerable.
The court also avoids saying whether the State Street Bank and AT & T v. Excel inventions would pass the new test. The drafting of claims in machine or process form was not determinative in those cases, for “we consider the scope of § 101 to be the same regardless of the form — machine or process — in which a particular claim is drafted.” AT & T v. Excel, 172 F.3d at 1357. From either the machine or the transformation viewpoint, the processing of data representing “price, profit, percentage, cost, or loss” in State Street Bank is not materially different from the processing of the Bilski data representing commodity purchase and sale prices, market transactions, and risk positions; yet Bilski is held to fail our new test, while State Street is left hanging. The uncertainty is illustrated in the contemporaneous decision of In re Comiskey, 499 F.3d 1365, 1378-79 (Fed.Cir.2007), where the court held that “systems that depend for their operation on human intelligence alone” to solve practical problems are not within the scope of Section 101; and In re Nuijten, 500 F.3d 1346, 1353-54 (Fed.Cir. 2007), where the court held that claims to a signal with an embedded digital watermark encoded according to a given encoding process were not directed to statutory subject matter under Section 101, although the claims included “physical but transitory forms of signal transmission such as radio broadcasts, electrical signals through a wire, and light pluses through a fiber-optic cable.”
Although this uncertainty may invite some to try their luck in court, the wider effect will be a disincentive to innovation-based commerce. For inventors, investors, competitors, and the public, the most grievous consequence is the effect on inventions not made or not developed because of uncertainty as to patent protection. Only the successes need the patent right.

The Bilski invention has not been examined for patentability

To be patentable, Bilski’s invention must be novel and non-obvious, and the specification and claims must meet the requirements of enablement, description, specificity, best mode, etc. See 35 U.S.C. § 101 (“Whoever invents or discovers a new and useful process ... may obtain a patent therefor, subject to the conditions and requirements of this title.”); Diehr, 450 U.S. at 190, 101 S.Ct. 1048 (the question of whether an invention is novel is distinct from whether the subject matter is statutory); State Street Bank, 149 F.3d at 1377 (“Whether the patent’s claims are too broad to be patentable is not to be judged under § 101, but rather under §§ 102, 103, and 112.”). I don’t know whether Bilski can meet these requirements — but neither does this court, for the claims have not been examined for patentability, and no rejections apart from Section 101 are included in this appeal.
Instead, the court states the “true issue before us” is “whether Applicants are seeking to claim a fundamental principle (such as an abstract idea) or mental process,” maj. op. at 952, and answers “yes.” With respect, that is the wrong question, and the wrong answer. Bilski’s patent application describes his process of analyzing the effects of supply and demand on commodity prices and the use of a coupled transaction strategy to hedge against these risks; this is not a fundamental principle or an abstract idea; it is not a mental process or a law of nature. It is a “process,” set out in successive steps, for obtaining and analyzing information and carrying out a series of commercial transactions for the purpose of “managing the consumption risk costs of a commodity *996 sold by a commodity provider at a fixed price.” Claim 1, preamble.
Because the process Bilski describes employs complex mathematical calculations to assess various elements of risk, any practicable embodiment would be conducted with the aid of a machine — a programmed computer — but the court holds that since computer-implementation is not recited in claim 1, for that reason alone the process fails the “machine” part of the court’s machine-or-transformation test. Maj. op. at 962. And the court holds that since Bilski’s process involves the processing of data concerning commodity prices and supply and demand and other risk factors, the process fails the “transformation” test because no “physical objects or substances” are transformed. Maj. op. at 963-64. The court then concludes that because Bilski’s Claim 1 fails the machine- or-transformation test it ipso facto preempts a “fundamental principle” and is thereby barred from the patent system under Section 101: an illogical leap that displays the flaws in the court’s analysis.
If a claim is unduly broad, or if it fails to include sufficient specificity, the appropriate ground of rejection is Section 112, for claims must “particularly point out and distinctly claim[]” the invention. See In re Vaeck, 947 F.2d 488, 495-96 (Fed.Cir. 1991) (affirming rejection under Section 112 where “[tjhere is no reasonable correlation between the narrow disclosure in applicant’s specification and the broad scope of protection sought in the claims”); In re Foster, 58 C.C.P.A. 1001, 438 F.2d 1011, 1016 (1971) (claims “not commensurate with appellants’ own definition of what they are seeking to cover” are rejected under Section 112, rather than Section 101); In re Prater, 415 F.2d at 1403-04 (applying Section 112 to claims that included mental steps). The filing of a broader claim than is supported in the specification does not convert the invention into an abstraction and evict the application from eligibility for examination. A broad first claim in a patent application is routine; it is not the crisis event postulated in the court’s opinion.
The role of examination is to determine the scope of the claims to which the applicant is entitled. See 37 C.F.R. § 1.104(a). The PTO’s regulations provide:
On taking up an application for examination or a patent in a reexamination proceeding, the examiner shall make a thorough study thereof and shall make a thorough investigation of the available prior art relating to the subject matter of the claimed invention. The examination shall be complete with respect to both compliance of the application or patent under reexamination with the applicable statutes and rules and to the patentability of the invention as claimed, as well as with respect to matters of form, unless otherwise indicated.
Id. § 1.104(a)(1). The Manual of Patent Examining Procedure (MPEP) similarly instructs the examiners to conduct a “thorough search of the prior art” before evaluating the invention under Section 101. MPEP § 2106(111) (8th ed., rev.7, July. 2008) (“Prior to evaluating the claimed invention under 35 U.S.C. § 101, USPTO personnel are expected to conduct a thorough search of the prior art.”). The MPEP also requires examiners to identify all grounds of rejection in the first official PTO action to avoid unnecessary delays in examination. Id. § 2106(11) (“Under the principles of compact prosecution, each claim should be reviewed for compliance with every statutory requirement for pat-entability in the initial review of the application, even if one or more claims are found to be deficient with respect to some statutory requirement.”). I note that this *997 requirement does not appear to have been here met.
Several amici curiae referred to the difficulties that the PTO has reported in examining patents in areas where the practice has been to preserve secrecy, for published prior art is sparse. The Federal Trade Commission recognized that the problem of “questionable” patents stems mostly from “the difficulty patent examiners can have in considering all the relevant prior art in the field and staying informed about the rapid advance of computer science.” FTC, To Promote Innovation: The Proper Balance of Competition & Patent Law and Policy at ch. 3, pp. 44 (Oct.2003), available at http://www.ftc.gov/os/2003/10/ innovationrptpdf. However, this problem seems to be remedied, for the PTO reported in 2007 that for Class 705, “[t]he cases the examiners are now working on have noticeably narrower claims” than the cases filed in or before FY 2000. PTO.Report at 9. The PTO reports that its search fields have been enlarged, staff added, and supervision augmented. FTC Report at ch. 1, p. 30. (“Since the PTO introduced [these changes] the allowance rate for business method patents has decreased, and the PTO believes that this decreased allowance rate indicates improved PTO searches for prior art.”). If this court’s purpose now is to improve the quality of issued patents by eliminating access to patenting for large classes of past, present, and future inventions, the remedy would appear to be excessive.
A straightforward, efficient, and ultimately fair approach to the evaluation of “new and useful” processes — quoting Section 101 — is to recognize that a process invention that is not clearly a “fundamental truth, law of nature, or abstract idea” is eligible for examination for patentability. I do not suggest that basic scientific discoveries are a proper subject matter of patents (the Court in Chakrabarty mentioned E=mc[2] and the law of gravity), and I do not attempt an all-purpose definition of the boundary between scientific theory and technological application. But it is rare indeed that a question arises at the boundary of basic science; more usual is the situation illustrated by Samuel Morse’s telegraph, in which the Court simply held that Morse’s general claim was “too broad,” exceeding the scope of his practical application.
Bilski’s process for determining risk in commodity transactions does not become an abstraction because it is broadly claimed in his first claim. It may be claimed so broadly that it reads on the prior art, but it is neither a fundamental truth nor an abstraction. Bilski’s ten other claims contain further details and limitations, removing them farther from abstraction. Although claim 1 may have been deemed “representative” with respect to Section 101, the differences among the claims may be significant with respect to Sections 102, 103, and 112. Bilski’s application, now pending for eleven years, has yet to be examined for patentability.
CONCLUSION
In sum, the text of Section 101, its statutory history, its interpretation by the Supreme Court, and its application by the courts, contravene this court’s redefinition of the statutory term “process.” The court’s decision affects present and future rights and incentives, and usurps the legislative role. The judicial role is to support stability and predictability in the law, with fidelity to statute and precedent, and respect for the principles of stare decisis.
Patents provide an incentive to invest in and work in new directions. In United States v. Line Material Co., 333 U.S. 287, 332, 68 S.Ct. 550, 92 L.Ed. 701 (1948), Justice Burton, joined by Chief Justice *998 Vinson and Justice Frankfurter, remarked that “the frontiers of science have expanded until civilization now depends largely upon discoveries on those frontiers to meet the infinite needs of the future. The United States, thus far, has taken a leading part in making those discoveries and in putting them to use.” This remains true today. It is antithetical to this incentive to restrict eligibility for patenting to what has been done in the past, and to foreclose what might be done in the future.

. My colleagues cite only part of this quotation as the Court’s holding in Flook, maj. op. at 955, ignoring the qualifying words ”[a]n argument can be made” as well as the next sentence clarifying that this argument was *980 rejected by the Court in Benson and is now again rejected in Flook.

. Many amici curiae pointed out that the Supreme Court did not adopt the test that this court now attributes to it. See, e.g., Br. of Amicus Curiae Am. Intellectual Property Law Ass'n at 18 & n.16; Br. of Amicus Curiae Biotechnology Industry Org. at 17-21; Br. of Amicus Curiae Boston Patent Law Ass'n at 6-8; Br. of Amicus Curiae Business Software Alliance at 13; Br. of Amicus Curiae Federal Circuit Bar Ass’n at 21; Br. of Amicus Curiae Regulatory Datacorp, Inc. at 12-13; Br. of Amicus Curiae Accenture at 16-17; Br. of Amicus Curiae Washington State Patent Law Ass'n at 10-11.

. Scholarly histories include M. Frumkin, The Origin of Patents, 27 J.P.O.S. 143 (1945); E. Wyndham Hulme, Privy Council Law and Practice of Letters Patent for Invention from the Restoration to 1794, 33 L.Q. Rev. 63 (Part I), 180 (Part II) (1917); Hulme, On the History of Patent Law in the Seventeenth and Eighteenth Centuries, 18 L.Q. Rev. 280 (1902); Hulme, The Histoiy of the Patent System Under the Prerogative and at Common Law, 12 L.Q. Rev. 141 (1896); Ramon A. Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S 615 (1959); Christine MacLeod, Inventing the Industrial Revolution: The English Patent System 1660-1800 (1988); Frank D. Prager, Historic Background and Foundation of American Patent Law, 5 Am. J. Legal Hist. 309 (1961); Brad Sherman & Lionel Bently, The Making of Modem Intellectual Property Law: The British Experience, 1760-1911 (1999); Edward C. Walterscheid, The Early Evolution of the United States Patent Law: Antecedents, printed serially at J. Pat. & Trademark Off. Soc'y (“J.P.T.O.S.”) 76:697 (1994) (Part 1); 76:849 (1994) (Part 2); 77:771, 847 (1995) (Part 3); 78:77 (1996) (Part 4); 78:615 (1996) (Part 5, part I); and 78:665 (1996) (Part 5, part II) (hereinafter “Early Evolution "); and Edward C. Walter-scheid, To Promote the Progress of Useful Arts: American Patent Law and Administration, 1798-1836 (1998).

. The PTO recognizes that patents on “business methods” have been eligible subject matter for two centuries. See USPTO White Paper 2 ("Financial patents in the paper-based technologies have been granted continuously for over two hundred years.”).

. Congress did substitute the word “process'' for “art” in the 1952 Act, but "[ajnalysis of the eligibility of a claim of patent protection for a 'process' did not change with the addition of that term to § 101.” Diamond v. Diehr, 450 U.S. 175, 184, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).